# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| CHRISTOPHER GUIDA, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br>v.<br><br>GAIA, INC.,<br><br>                Defendant. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Christopher Guida ("Plaintiff"), on behalf of himself and all other persons similarly situated, brings this action against Defendant Gaia, Inc. ("Gaia" or "Defendant"). Plaintiff makes these allegations on personal knowledge as to himself and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff brings this consumer privacy class action on behalf of subscribers to Gaia's video streaming service who obtained specific video materials from its websites and applications and had a Facebook account during the time Gaia used Facebook Pixel. Gaia's systematic practice of knowingly disclosing its subscribers' personally identifiable information ("PII") to third-party Facebook, Inc. (now known as Meta Platforms, Inc.) without their informed, written consent violates the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "Act").

2.      Gaia is a digital streaming company that provides its more than 800,000 subscribers access to a vast and growing video library containing films, series, documentaries, and classes on the subjects of yoga, transformation, alternative healing, and mindfulness.

3.      Congress enacted the VPPA in 1988 to give consumers "control over personal information divulged" in exchange for "services from video tape service providers," S. Rep. No. 100-

599, at 8, by prohibiting these providers from "knowingly disclosing" "personally identifiable information concerning any consumer." This includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," without the consumer's specific and informed prior written consent. Defendant violated each element of this Act.

4.      Plaintiff and the other members of the Class (defined below) are "consumers" because they are paid subscribers to at least one of Gaia's two websites. And Defendant is a "video tape service provider" because it operates a digital video streaming subscription service that provides its subscribers with access to video content through its websites and applications.

5.      Defendant knowingly discloses its subscribers' "personally identifiable information" ("PII") to Facebook through its use of the "Facebook Pixel" or "Pixel," a programming code that Facebook makes available to Gaia to collect granular information about its subscribers' interactions with its websites. Facebook uses this information to build detailed profiles about Gaia's subscribers that enables Gaia to serve them with targeted advertisements on Facebook and otherwise facilitates Gaia's use of Facebook's advertising services.

6.      Defendant intentionally installed the Pixel and selected the specific user information the Pixel would collect from its subscribers and send to Facebook, including specific videos the user accessed (via the video's title and the URL for the video) and the subscriber's unencrypted and personally and publicly identifiable Facebook ID ("FID").

7.      The FID is a unique sequence of numbers linked to an individual's Facebook profile that identifies the individual more precisely than a name or email address. Indeed, entering "facebook.com/[FID]" into any web browser returns the Facebook profile of the specific individual. Because a subscriber's FID uniquely and personally identifies that person's Facebook account, an unencrypted FID allows any ordinary person to quickly and easily use an unencrypted FID to locate,

access, and view a particular subscriber's Facebook profile, and all of the detailed and personal information contained in it.

8.     Gaia thus discloses to Facebook through the Pixel in one transmission the following information each time a subscriber accesses a video on its websites or applications: (1) the video's title and URL; and (2) detailed, personal information that easily identifies the subscriber via the FID. This information constitutes PII under the VPPA.

9.     Finally, Defendant did not obtain—or even seek—the separate, informed written consent needed for it to lawfully disclose the PII of Plaintiff or any other Class member.

10.    Accordingly, Plaintiff and all similarly situated subscribers are "aggrieved persons" under the VPPA seeking to enjoin Defendant from further unauthorized disclosures of PII; awarding actual damages no less than liquidated damages of $2,500 per violation, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest as permitted by law; and any other relief the Court deems appropriate.

## PARTIES

11.    Plaintiff Christopher Guida ("Plaintiff") is a citizen and resident of Illinois.

12.    During the two years before he filed this action, including within the past year, Plaintiff has had a Facebook account, subscribed to Defendant's digital video streaming service, used a laptop to access streaming video content on Defendant's gaia.com website, and accessed streaming video content on the Gaia app installed on his smart phone.

13.    Defendant Gaia, Inc. is a Colorado corporation with its principal place of business located at 833 W. South Boulder Road, Louisville, Colorado 80027.

14.    Defendant is a publicly traded company that owns and operates a video subscription service containing films, documentaries, series, classes and other content available for streaming through its Gaia (gaia.com) and Yoga International (yogainternational.com) websites.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over Defendant because its principal place of business is in Colorado.

16.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17.     Venue is appropriate in this Court because Defendant resides in this District, and much of the conduct alleged in this lawsuit occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.      The Video Privacy Protection Act

18.     With certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without first obtaining the consumer's informed, written consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710.

19.     Congress passed the VPPA to protect the privacy of individuals' video rental, purchase, and viewing information, so that consumers can "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599 at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.* at 7-8.

20.     The need for the protections of the VPPA are more pronounced today than ever, given the largely unregulated, sprawling, and lucrative market for consumers' online personal data, including their video watching habits. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized this point: "While it is true that technology has changed over the years, we must stay

4

faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

21.     Gaia knowingly deprived Plaintiff and the proposed Class members of this important right for its own profit by systematically disclosing their PII to Facebook in violation of the Act.

**II.     Plaintiff and the Other Class Members Subscribe to Defendant's Services.**

22.     Defendant owns and operates the Gaia and Yoga International websites and applications (collectively, the "websites"). Each website provides streaming video content to its subscribers.

23.     To access video content on the Gaia website, an individual must purchase one of the following subscription plans from Defendant:



24.     To access video content on the Yoga International website, an individual must purchase one of the following subscription plans from Defendant:



25.     To purchase a subscription plan on either website, an individual must provide to Gaia certain personal information, including personally identifiable information like their name, physical address, email address, and credit card number.

26.     As shown in a recent investor presentation, Defendant's 2021 year-end balance sheet noted that it had 821,000 "members," *i.e.*, subscribers, and assigned an estimated value of $287,350,000 to this asset.

27.     All subscribers to the websites are consumers under the VPPA.

**III.   Gaia is a "Video Tape Services Provider" Because it Streams Video Content.**

28.     Defendant provides video tape services to its subscribers by offering an array of video content over the two websites and corresponding apps it owns and operates.

29.     According to Defendant's 2021 annual report, included in the most recent 10-K it filed with the U.S. Securities and Exchange Commission, Gaia "operates a global digital video subscription service and on-line community that caters to a unique and underserved member base." Its "digital content library includes over 10,000 titles," and its "members have unlimited access to this vast library of inspiring films, cutting edge documentaries, interviews, yoga classes, transformation-related

content, and more – 80% of which is exclusively available to our members for digital streaming on most internet-connected devices anytime, anywhere, commercial free."

30.     "Gaia's position in the streaming video landscape," Defendant reported, "is firmly supported by its wide variety of exclusive and unique content, which provides a complementary offering to other entertainment-based streaming video services." Defendant's video content "is currently focused on yoga, transformation, alternative healing, seeking truth and conscious films," which is "delivered directly to [its] members through [its] streaming platform."

31.     Defendant's "content is specifically targeted to a unique member base that is interested in alternatives and supplements to the content provided by mainstream media." Gaia reported that "we have grown these content options both organically through our own productions and through strategic acquisitions. In addition, through our investments in our streaming video technology and our user interface, we have expanded the many ways our subscription member base can access our unique library of media titles."

32.     Defendant's videos are comprised of its own proprietary content developed at its production studios near Boulder, Colorado. This content "currently represents approximately 75% of [its] viewership."  Gaia also offers third-party content obtained via long-term licensing agreements.

33.     The following screen shot from the gaia.com homepage demonstrates that streaming video content to subscribers is the core service that Defendant provides:



34.     On December 22, 2021, Defendant completed its acquisition of Yoga International, Inc., a popular "online platform for yoga practice and education." "With the acquisition," Defendant noted, "Gaia now has a subscription offering tailored to the unique needs of consumers focused on the lifestyle and philosophy of yoga." This "acquisition expanded Gaia's content library by 4,000 hours of content and also added a stand-alone digital yoga subscription service to" its "already vast library."

35.     Defendant's subsequent regulatory filings show that it now owns Yoga International. Yoga International's Terms of Use similarly states that "the Yoga International and Gaia websites" are both "owned and operated by Gaia, Inc., a Colorado corporation, and its affiliates."

36.     The following screen shot from the yogainternational.com homepage shows that Defendant's core service for its subscribers is providing them with streaming video content:



37.     Defendant is a prototypical video tape service provider under the VPPA.

## IV.    Defendant Knowingly Discloses Subscribers' PII to Facebook Whenever They Access Videos on its Websites.

38.     Defendant knowingly discloses Plaintiff's and other Class members' PII to Facebook through the Pixel code it embedded on its websites.

39.     The Facebook Pixel, first introduced in 2013, allows online businesses like Gaia to build detailed profiles about its users by collecting information about how they interact with their

websites and facilitates the service of targeted advertising to them. The Pixel commonly relays whether users initiate purchases, what items they view, and, as relevant here, the exact content accessed on a particular webpage, including specific video materials. The Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

40.     Defendant collects, uses and shares subscribers' personal information obtained through its websites for various marketing and advertising purposes, as demonstrated generally by provisions in its Privacy Policy.

41.     Defendant's Privacy Policy states that it "collect[s] information that identifies, relates to, describes, or could reasonably be linked, directly or indirectly, with a particular consumer or household." The Policy specifies "categories" of this "personal information" that Defendant has collected "from consumers within the last twelve (12) months," including "IP addresses," "Internet or other electronic network activity information," and "Identifiers."

42.     The Policy states the following about "Identifiers:"

> 'Identifiers' covers a broad range of information, including things like name, email address, billing address, and IP address. We collect personal information that falls into this category. For example, for subscribers we have an email address and payment information (such as a credit card). We collect IP addresses when you connect to our service online. These sorts of identifiers are connected to your Gaia account. There are also identifiers we use for purposes like advertising (third party advertising cookies on our website) that we do not associate with your account, but that can be used to reach you with promotional messages on other websites and applications.

43.     Defendant's Privacy Policy states that it "use[s] categories of . . . personal information listed above," among other things, to "enhance and personalize our services and marketing efforts."

44.     The Policy notes that Defendant "use[s] such information" in various ways, including to: "determine your general geographic location, provide localized content, provide you with customized and personalized viewing recommendations for titles and shows we think will be of interest to you"; "coordinate with Partners around making the Gaia service available to members and

providing information to non-members about the availability of the Gaia service, based on the specific relationship you have with the Partner"; and "analyze and understand our audience, improve our service (including our user interface experiences) and optimize content selection, recommendation algorithms and delivery."

45.     Defendant's Privacy Policy also acknowledges that it uses cookies to track and serve subscribers with targeted advertising on other websites they visit. Specifically, Defendant notes that: "[c]ertain features on the Websites and/or the Service utilize cookie technology"; it "may use cookies to enhance [subscribers'] experience on our Websites, to determine user traffic patterns and for other purposes"; it "use[s] cookies to improve the performance of our advertising on other websites"; and it "may employ third parties to perform services or functions on our behalf in order to improve our . . . marketing and promotional efforts" (while noting the third parties "have access to personal information needed to perform their functions").

46.     One important tool employing third-party cookies that Defendant uses to further its advertising goals—but does not disclose or discuss in its Terms of Use, Privacy Policy or any other material provided to subscribers—is the Facebook Pixel.

47.     Pixel is a unique string of code that businesses install on their websites. It places and triggers specific cookies of the businesses' choosing that track users' Internet activity and utilizes that information to build detailed user profiles. Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

48.     Facebook promotes the Pixel to companies like Gaia as a "powerful tool" that can "help power [its] Facebook ads . . . [to] reach a more relevant audience, provide a more personalized ad experience and optimize [its] ad campaigns towards better business outcomes." Facebook also profits from Pixel. While Facebook does not charge businesses to install the Pixel on their websites, it charges them to place the advertising that the Pixel makes possible on Facebook's platform. The

Pixel is an important piece of Facebook's advertising business, which comprises 97% of the company's annual revenue and has made it the world's leading social media marketing platform. As shown below, Facebook's advertising revenues have increased significantly year after year since 2015, culminating in nearly $115 billion in worldwide revenue in 2021:



49.     To take advantage of Facebook's targeted advertising and analytical services, Defendant intentionally installed the Pixel on its websites via step-by-step instructions provided on Facebook's website.

50.     During the installation process, Defendant chose certain of a menu of available "Events" incorporation into the Pixel installed on its websites. Pixel's Events track specific information about the activity of users while they visit a company's website. One of the Events that Defendant chose for its Pixel is "PageView." PageView captures and shares the URL and title of each video a subscriber accesses on its sites, as shown below:





51.     Defendant also knew that the Pixel installed on their websites would send Facebook cookies identifying their subscribers, including unencrypted FIDs. This is demonstrated by, among other things, Defendant's familiarity with and use of identifying cookies in connection with its targeted advertising in general, and its knowledge of how the Pixel worked, *i.e.*, that the Pixel's sharing of information with Facebook enabled Defendant's websites to show targeted advertising to its digital subscribers based on the video content those subscribers had viewed on the websites.

52.     An FID is a unique, personal, and persistent identifier Facebook assigns to each of its users that allows anyone to look up the user's Facebook profile to learn that person's identity. If the FIB is combined with a video title watched by that Facebook user—all of which Defendant knowingly provides to Facebook through the Pixel embedded on its websites—any ordinary person could identity a subscriber and the specific video materials that subscriber accessed on Defendant's sites.

53.     On the Gaia website, Defendant disclosed to Facebook the video title and FID of a Gaia subscriber in a single transmission via the Facebook Pixel. This transmission is depicted in the following exemplar screenshot excerpt:



54.    In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons). Box C shows the URL of a "video" with the title of "Chasing the Present" (in highlighted format) that was accessed on "www.gaia.com."

55.    The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:



56.    In this table, Box A shows that the subscriber accessed the URL of https://www.gaia.com/video/chasing-the-present. Box B shows that the "title" of the "documentary" is "Chasing the Present," it and also gives a "description" of the "movie." The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

57.    Entering the video's URL identified in the preceding graphics into a web browser pulls up the video.

58.    An ordinary person could identify the subscriber accessing this video by entering the unencrypted FID associated with the c_user cookie on their search bar as follows: https://www.facebook.com/[unecrypted FID]/. Doing so reveals the subscriber's Facebook profile that identifies the subscriber. This basic method of accessing a person's Facebook profile is generally and widely known among the public.

59.    An exemplar Facebook profile of the type one would see after entering a subscriber's unencrypted FID follows:



60.     On the Yoga International website, Defendant disclosed to Facebook the video title and FID of a subscriber in a single transmission via the Facebook Pixel.

61.     This transmission is depicted in the following screenshot:



62.     In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons). Box C shows the URL for "Vinyoga Structural Class" that was accessed on www.yogainternational.com, and subsequently characterizes identifies the "title" and "name" of the class as a "Video Object" (all highlighted).

63.     The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:



64.     In this table, Box A shows that the subscriber accessed the URL of https://yogainternational.com/class/vinyoga-structural-class. Box B shows that the "title" of the video is "Vinyoga Structural Class," and it also gives a "description" of the class. Box C identifies the

content as a "Video Object," while again providing its title and description. The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

65.     Entering the URL identified in the preceding graphics on a web browser pulls up the video.

66.     Accordingly, Defendant violates the VPPA by knowingly disclosing its subscribers' FIDs alongside the specific accessed videos to Facebook.

## V.     Defendant Discloses Subscribers' PII to Facebook Without Consent.

67.      Defendant does not request or receive separate, informed written consent when disclosing Plaintiff's or Class members' PII to Facebook, even though Defendant must obtain informed, written consent "in a form distinct from any form setting forth" the consumers' "other legal or financial obligations.  *See* 18 U.S.C. § 2710(b)(2)

68.     Instead, Defendant provides links to its Terms of Use and Privacy Policy, which subscribers need not click or read during the registration process for each website.

69.     Defendant's Privacy Policy, quote above, contains only general statements that it may use cookies to collect and share certain personally identifiable subscriber information with third parties for advertising purposes. Defendant's Terms of Use provide even less information about subscribers' personal information and how it may use this. Neither document discloses that Defendant collects and transmits the specific subscriber PII at issue herein to Facebook.

70.     Even if Defendant's Terms of Use and Privacy Policy contained the informed, written consent required under the VPPA (which it does not), it is not in a form separate and distinct from consumers' other legal and financial obligations.

71.     Moreover, Defendant does not obtain informed, written consent when it seeks to disclose consumers' PII or in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner.

72.     Defendant also does not provide consumers like Plaintiff with the opportunity – in a clear and conspicuous manner – to withdrawn consent on a case-by-case basis or to withdraw consent from ongoing disclosures at the consumers' election.

73.     Accordingly, Defendant violates the VPPA by knowingly disclosing its subscribers' PII to Facebook without consent.

## PLAINTIFF-SPECIFIC ALLEGATIONS

74.     Plaintiff has subscribed to Defendant's Gaia website since 2015, and he has had a Facebook account since 2007.

75.     During the two years before this action was filed, including within the past year, Plaintiff has used an Internet-connected laptop to access video content on gaia.com and an Internet-connected smart phone to access video content on Gaia's app.

76.     On information and belief, Defendant disclosed to Facebook Plaintiff's unencrypted FID along with the title and URLs of the videos he accessed on Defendant's gaia.com website and app within the past two years, including the past year, on one or more occasions.

77.     Defendant did not seek or obtain Plaintiff's informed, written consent for any of the aforementioned disclosures, including in a separate and distinct form from any other document setting forth any other legal or financial obligations Plaintiff had to Defendant.

78.     Each time Defendant disclosed Plaintiff's PII to Facebook, it violated his rights under the VPPA.

## CLASS ALLEGATIONS

79.     Plaintiff brings this lawsuit under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who subscribed to Gaia (gaia.com) or Yoga International (yogainternational.com) and accessed video content on either website or app while having a Facebook account.

80.     The Class Period is from September 12, 2020 to the present for Gaia subscribers and from December 22, 2021 to the present for Yoga International subscribers.

81.     Excluded from the Class is Defendant, any control person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person.

82.     Plaintiff reserves the right to modify, change, or expand the Class definition based upon information obtained in discovery or through further investigation.

83.     **Numerosity**: The Class consists of at least thousands, and likely hundreds of thousands, of ascertainable individuals, making joinder impractical.

84.     **Commonality and Predominance**: Common questions of law and fact exist concerning the Class's claim and predominate over any questions affecting only individual Class members. Questions common to the Class include:

    a.    Whether Plaintiff and the Class members are "consumers;"

    b.    Whether Defendant is a "video tape service provider;"

    c.    Whether the information Defendant disclosed to Facebook constitutes "personally identifiable information;"

    d.    Whether Defendant "knowingly disclosed" Plaintiff's and the Class members' PII to Facebook;

    e.    Whether Defendant obtained "the informed, written consent" of Plaintiff and the Class members "in a form distinct and separate from any form setting forth other legal or financial obligations" of those individuals;

f.  Whether Defendant "provided an opportunity, in a clear and conspicuous manner," for Plaintiff and the Class members "to withdraw on a case-by-case basis or to withdraw from ongoing disclosures," at their "election;"

g.  Whether Plaintiff and the Class members are "aggrieved persons;"

h.  Whether Defendant's conduct violates the VPPA;

i.  Whether Defendant should be enjoined from disclosing Plaintiff's and the Class members' PII; and

j.  The extent and form of any other preliminary or equitable relief that the Court determines appropriate.

85.  **Typicality:** Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all Class members, has been injured in the same way by Defendant's misconduct—disclosing consumers' PII to Facebook—and seeks the same legal relief to remedy this misconduct.

86.  **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including data privacy cases. Plaintiff does not have any interests antagonistic to those of the Class.

87.  **Ascertainability**: The members of the Class can be readily determined through objective criteria and the utilization of data in the possession of Defendant or third-party Facebook that will identify Defendant's subscribers whose privacy rights as set forth in the VPPA were violated due to Defendant's misconduct as alleged herein.

88.  **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages and injunctive relief are essential to induce Defendant to comply with federal privacy law. Moreover, Class members are very unlikely to pursue legal redress individually for the violations detailed herein because the amount of each Class

member's claim is prohibitively small relative to the complexity of the litigation, the resources necessary to effectively prosecute this action, and Defendant's significant resources. A class action will allow these claims to be brought where they would otherwise go unaddressed because of the prohibitive costs of bringing individual lawsuits. Finally, a class action would provide the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSE OF ACTION

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

89.     Plaintiff incorporates and realleges the above factual allegations by reference.

90.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

91.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and Class members are subscribers to Defendant's services that provide video content. Thus, Plaintiff and Class members are "consumers" under this definition.

92.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" because it provides online video streaming services to its subscribers.

93.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Defendant disclosed Plaintiff's and Class members'

"personally identifiable information"—specifically, their unencrypted FIDs and the title and URL of the videos they requested or obtained—to Facebook.

94.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Facebook as an individual who accessed Defendant's video content, including the specific video materials requested or obtained on Defendant's website. Indeed, anyone with an FID could identify the individual associated with it simply by entering "facebook.com/[FID]" into a web browser.

95.     Pursuant to 18 U.S.C. § 2710(b)(1), Defendant "knowingly" disclosed the PII of Plaintiff and the Class members because it intentionally programmed the Facebook Pixel into its website code while knowing that Facebook would receive video titles and the subscriber's FID when a subscriber requested or obtained a specific video.

96.     Defendant never obtained from Plaintiff or any Class member the separate and informed written consent needed to lawfully disclose their PII to a third-party pursuant to 18 U.S.C. § 2710(b)(2). More specifically, Defendant never obtained from Plaintiff or any Class member informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election.

97.     By disclosing Plaintiff's and Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to privacy in their video-watching activity, and they are each "aggrieved persons" entitled to relief under 18 U.S.C. § 2710(c).

98.     As a result of these violations, Defendant is liable to Plaintiff and Class members.

99.     On behalf of himself and all members of the Class, pursuant to 18 U.S.C. § 2710(c)(2)(A), Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; punitive damages; reasonable attorneys' fees and costs; pre- and post-judgment interest as allowed by law; and all other preliminary or equitable relief the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

   i.   Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

   ii.   Enter judgment in favor of Plaintiff and the Class;

   iii.   Enjoin Defendant's future disclosures of Plaintiff's and Class members' PII;

   iv.   Award Plaintiff and Class members actual damages but not less than liquidated damages in an amount of $2,500 per violation;

   v.   Award Plaintiff and Class members punitive damages;

   vi.   Award Plaintiff and Class members reasonable attorneys' fees and other litigation costs reasonably incurred;

   vii.   Award Plaintiff and Class members pre- and post-judgment interest as provided by law; and

   viii.   Award such other preliminary and equitable relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: September 12, 2022

Respectfully submitted,

*/s/  Christopher J. Cormier*

Christopher J. Cormier (#47326)
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

Hannah Crowe
Lauren Cross
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Tel: (469) 904-4550
hcrowe@burnscharest.com
lcross@burnscharest.com

Rachel Geman
Douglas I. Cuthbertson
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel: (212) 355-9500
rgeman@lchb.com
dcuthbertson@lchb.com

Shawn M. Kennedy
HERRERA KENNEDY LLP
4590 MacArthur Blvd., Suite 500
Newport Beach, CA 92660
Tel: (949) 936-0900
skennedy@herrerakennedy.com

*Attorneys for Plaintiff and the Proposed Class*