IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02350-PAB-MEH

CHRISTOPHER GUIDA, on behalf of
himself and others similarly situated,

    Plaintiff,

v.

GAIA, INC.,

    Defendant.

---

**DEFENDANT'S MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

---

Defendant Gaia, Inc. ("Gaia"), by and through its undersigned counsel, hereby moves the Court to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively.

**PRELIMINARY STATEMENT**

This putative class action against Gaia is part of a deluge of lawsuits filed the past several years by plaintiffs' counsel under the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710, ("VPPA"), based on the alleged disclosure of consumers' personally identifiable information ("PII") to Facebook (now called Meta Platforms, Inc.), allegedly by Facebook's own application, Facebook Pixel ("Pixel"). Congress originally enacted the VPPA in 1988 after the Washington City Paper published Supreme Court nominee Robert Bork's video rental history. *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). Congress passed the Act "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audit visual materials." *Id*. Despite the narrow focus of the statute, class actions have

proliferated in recent years in an attempt to expand the statute's limited reach. This case is no different and should be dismissed for lack of standing and failure to present viable claims.

Here, Plaintiff alleges that Gaia installed Pixel, and Pixel subsequently identified and transmitted to Facebook (i) a Gaia subscriber's Facebook profile identifier ("FID") along with (ii) information about videos the subscriber watched while using Gaia's website. Notably, Plaintiff's allegations do not establish that Gaia transmitted *his* PII to Facebook in any specific instance. Nonetheless, Plaintiff incorrectly concludes that such allegations constitute a *knowing* transfer of *his* PII to Facebook, in violation of the VPPA.

As a threshold matter, Plaintiff lacks standing to bring this lawsuit. Specifically, Plaintiff fails to allege any concrete injury beyond the statutory damages provided by the VPPA. Plaintiff does not allege *any* facts plausibly suggesting that he suffered harm due to Gaia's alleged conduct. Plaintiff merely alleges "[o]n information and belief" that Gaia "disclosed to Facebook Plaintiff's unencrypted FID along with the title and URLs of the videos he accessed on Defendant's gaia.com website and app." (Dkt. 1, hereafter "Compl." ¶ 76.) Notably, the FID is a Facebook created identifier – not something Gaia created or gave to either Plaintiff or Facebook. Indeed, the Complaint contains no allegation explaining what, if any, injury Plaintiff suffered as a result of Gaia's purported disclosures. Absent any injury-in-fact, Plaintiff lacks standing to pursue his claim under the VPPA.

Moreover, the Complaint allegations fail to establish a VPPA claim when viewed through the lens of *Twombly*. First, Plaintiff does not plausibly allege that Gaia *itself* disclosed its subscribers' PII to Facebook. Rather, the Complaint allegations suggest otherwise – that, at best, Facebook applied its own technology using Pixel and the "c_user" cookie to identify and track its users' activity on Gaia's website. Second, setting aside Plaintiff's conclusory allegations, it's not

2

plausible that the FIDs and URLs that were allegedly disclosed by Gaia readily permit an ordinary person to identify a *specific individual's* video-watching behavior. Third, the allegations undercut Plaintiff's conclusion that Gaia *knowingly* disclosed its subscribers' PII as required by the VPPA. Simply put, the allegations do not establish that Gaia knew that 1) Plaintiff had a Facebook account with an FID or that 2) Facebook would combine its users' identities with their video watching activity on Gaia's website. For these and other reasons explained below, Plaintiff's Complaint should be dismissed.

## FACTS ALLEGED IN THE COMPLAINT

Gaia is a digital streaming company that provides its subscribers with access to a video library containing films, series, documentaries, and classes on the subject of yoga, transformation, alternative healing, and mindfulness. (Compl. ¶ 2.) Plaintiff alleges that he had a Facebook account, subscribed to Gaia's digital video streaming service, used a laptop to access streaming video content on Gaia's website, and accessed streaming video content on the Gaia app installed on his smartphone. (*Id.* ¶ 12.) Nowhere does Plaintiff allege that *his* identity or *his* specific video viewing activity was disclosed to Facebook or anyone else for that matter. Plaintiff then concludes, in summary fashion, that Gaia, "through its use of" Facebook's Pixel, has been transmitting PII to Facebook. However, the primary PII the Complaint alleges has been disclosed to Facebook is a Gaia subscriber's FID, which apparently identifies a specific Facebook user through a series of numbers. (*Id.* ¶¶ 6-7.) Moreover, the Complaint alleges that "Pixel installed on their websites would send Facebook cookies identifying their subscribers, including unencrypted FIDs." (*Id.* ¶¶ 50-51.) Plaintiff then reiterates this: "Pixel sent the same specific types of PII to Facebook." (*Id.* ¶ 55.) If necessary, these allegations can be evaluated by taking judicial notice of Facebook's

3

website, which paragraph 48 of the Complaint incorporates by reference.[1] At bottom, Plaintiff's VPPA claim is grounded in actions dictated by Facebook code and utilizing Facebook's own technology – that is, it is *Facebook* that places the cookie on its user's browser, and it is *Facebook* that utilizes Pixel and its cookies to identify and track its users' activity on Gaia's website. This, of course, is only after Plaintiff decides to have a Facebook account.

## ARGUMENT

### I. Legal Standards.

To survive a motion to dismiss for lack of Article III standing under Rule 12(b)(1), a plaintiff must have (1) "suffered an injury in fact," (2) that is "fairly traceable to the challenged action of the defendant," and (3) that is likely to be "redressed by a favorable decision." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). In *Spokeo* and *TransUnion*, "the Supreme Court explained that a statutory violation does not necessarily establish an injury in fact." *Id.* "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 877 (citing *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 (2021)).

In order to withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Conclusory allegations have no bearing upon the court's

---

[1] The Court can consider the Facebook website in resolving this motion because (a) it is judicially noticeable since it is publicly available and not reasonably subject to dispute, (b) Plaintiff quotes Facebook's website in Paragraph 48 of the Complaint, and (c) whether Gaia is involved in the disclosure is central to Plaintiff's claim. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *Hawg Tools, LLC v. Newso Int'l Energy Servs., Inc.*, No. 14-CV-03011-REB-MJW, 2015 WL 1064519, at *2 (D. Colo. Feb. 23, 2015).

consideration. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Indeed, plaintiff's burden "requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 546. As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." 493 F.3d 1174, 1177 (10th Cir. 2007).

**II.     Plaintiff Lacks Standing to Bring a Claim Under the VPPA.**

The Court may dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A plaintiff's lack of standing is jurisdictional. *Colo. Envtl. Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004). To establish Article III standing, complaint allegations must establish (1) an injury in fact that is concrete, particularized, actual and imminent and not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely and not merely speculative that the injury will be redressed by a favorable decision. *Thrasher v. Rocky Auto Brokers, Inc.*, 2019 WL 4695831, *4 (D. Colo., September 25, 2019) (*citing Lujan*, 504 U.S. at 560-61).

Here, Plaintiff's Complaint fails to establish standing under recent Supreme Court precedent: *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). In *TransUnion*, a class alleged that the defendant credit reporting agency violated the Fair Credit Reporting Act by failing to use reasonable procedures to ensure the accuracy of internally maintained credit files. 141 S. Ct. at 2200. As the Supreme Court succinctly emphasized, "No concrete harm, no standing." *Id.* Physical, monetary or other tangible injury are typically sufficiently concrete to confer standing. *Id.* at 2204. Intangible harm may be sufficient if the "harm has a 'close relationship' to a harm

traditionally recognized as providing a basis for a lawsuit in American courts[.]" *Id.* at 2200, 2204. The Court observed that Congress's view may be "instructive" in determining whether a harm is concrete, but cautioned that "an injury in law is not an injury in fact." *Id.* at 2204-05.

Plaintiff does not establish that he suffered a concrete injury under Supreme Court precedent. Plaintiff does not and cannot allege any physical, monetary, or other tangible injury. *Garrett v. Fin. Bus. & Consumer Sols., Inc.*, No. 20-CV-02754-MEH, 2021 WL 3726199, at *2 (D. Colo. Aug. 23, 2021) (holding that plaintiff lacked standing because plaintiff failed to allege injuries that rise to the level of tangible harm). Plaintiff does not allege any specific instance where his PII was disclosed to his detriment and that he consequently suffered any harm. Plaintiff does not even allege that his own Facebook account included his personal information or used his real name such that he could be personally identified. In fact, the Complaint's key substantive allegations at Paragraphs 50 through 66 appear to be based on hypothetical and unattributed Facebook and Gaia accounts – the allegations do not reference harm to Plaintiff in any way, shape or form. The only references to harm or injury to Plaintiff in the Complaint are general in nature. For example, paragraph 85 states, "Plaintiff, like all Class members, has been injured in the same way by Defendant's misconduct[.]" The Complaint also merely alleges that "[e]ach time Defendant disclosed Plaintiff's PII to Facebook, it violated his rights under the VPPA." (Compl. ¶ 78.) These general references to a violation of statutory rights does not automatically establish injury-in-fact. *Laufer*, 22 F.4th at 877.

*Thrasher v. Rocky Mountain Auto Brokers, Inc.*, is instructive. No. 18-CV-02342-PAB-KMT, 2019 WL 4695831, at *6 (D. Colo. Sept. 25, 2019). In *Thrasher*, plaintiffs filed a putative class action asserting a single claim under the Electronic Fund Transfer Act ("EFTA"). Plaintiffs purchased automobiles on credit, which conditioned the extension of credit on plaintiffs' consent

6

to automatic electronic fund transfer payments. *Id.* at *1. Plaintiffs asserted that the EFTA created a legal right to be free from having to use automatic payment arrangements and plaintiffs suffered a concrete injury through defendant's deprivation of that right. *Id.* at *4. This Court applied Supreme Court precedent in *Spokeo* observing that "a bare procedure violation [of a statute] divorced from any concrete harm' does not satisfy the injury-in-fact requirement of Article III." *Id.* at *5 (internal citation omitted). This Court held that "plaintiffs have not alleged an injury suffered as a result of defendant's conduct beyond defendant's alleged violation of the EFTA" and dismissed the complaint for failure to establish Article III standing. *Id.* at *6.

Here too, Plaintiff alleges no injury suffered as a result of Gaia's conduct beyond Gaia's alleged violation of the VPPA. Absent any injury-in-fact, Plaintiff lacks standing to pursue his Complaint and it should be dismissed.

### III.    Plaintiff Fails to Allege that Gaia Disclosed PII in Violation of the VPPA.

The VPPA specifically regulates the disclosure of PII or "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(3). For an actionable claim, a video tape service provider must knowingly disclose (1) a consumer's identity; (2) the identity of specific video materials; and (3) the fact that the person identified requested or obtained that material. *In re Hulu Privacy Litig.*, 86 F.Supp.3d 1090, 1095 (N.D. Cal. 2015). Moreover, the allegedly disclosed PII must be the type of information "that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 290; *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017). For purposes of this motion, Gaia does not contest its status as a video tape service provider and Plaintiff's status as a consumer.

7

However, as explained below, the Complaint allegations fail to establish that Gaia knowingly transmitted PII to Facebook in violation of the VPPA.

### A. Gaia Did Not Transmit PII to Facebook.

Here, the Complaint does not allege facts supporting an inference that it was *Gaia* that disclosed any of its subscribers' PII. When analyzed closely, the allegations merely reflect that Facebook is using its own technology, namely Pixel and the c_user cookie, to identify its users' activities on Gaia's website. Plaintiff simply concludes that Gaia has disclosed PII "through its use of the 'Facebook Pixel.'" (Compl. ¶ 5.) However, this bald-faced assertion is undercut by the Complaint's substantive allegations.

Plaintiff alleges that Gaia transmitted through Pixel its subscribers' FIDs and video viewing activity to Facebook in violation of the VPPA. (*Id.* ¶¶ 6, 8.) The Complaint alleges the FID "is a unique sequence of numbers linked to an individual's Facebook profile." (*Id.* ¶ 7.) While the Complaint summarily concludes that Gaia disclosed FIDs to Facebook through Pixel, other substantive allegations demonstrate that Facebook applied its own technology using Pixel and the c_user cookie to identify its users' activity on Gaia's website using Facebook's own created FID – rather than through any affirmative disclosures by Gaia.

Pixel is a Facebook technology that is a "string of code that businesses install on their websites" and is a "powerful tool" that can "help power [its] Facebook ads …" (*Id*. ¶¶ 46-48.) According to Plaintiff's allegations, the FID is actually conveyed through Facebook's c_user cookie as reflected by a string of numbers following the c_user text string. (*Id*. ¶¶ 54, 61.) Facebook places a c_user cookie on a Facebook user's web browser or device when that user logs into

8

Facebook.[2] In short, when someone, like Plaintiff, decides to have a Facebook account, Facebook assigns both an FID and c_user cookie. Aside from Plaintiff's conclusory assertions, there are no detailed allegations as to how Gaia purportedly transmits FIDs through Pixel. Indeed, Plaintiff's allegations concern Plaintiff's and Facebook's actions – *not* Gaia's. Importantly, there are no allegations providing any context for the screenshots at paragraphs 53 or 61, which purportedly evidence Gaia's disclosure of FIDs through Pixel.[3] A portion of the screenshot from paragraph 53 is excerpted below for reference:



It appears from the screenshots at paragraphs 53 and 61, however, that they merely reflect activity on Facebook's website. This can be discerned from the "HOST" and "GET" fields in the screenshots that designate www.facebook.com in the text strings. Paragraph 53 summarily

---

[2] Facebook, *Cookies Policy*, https://www.facebook.com/policy/cookies/. *See also Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (stating that "Facebook puts cookies on visitors' computers. It uses these cookies to store information about each visitor—for instance, the "c _user" cookie is a unique identifier … [l]ike IP addresses, cookies are included with each request that the visitor's browser makes to Facebook's servers … [u]sing these techniques, Facebook can identify individual users and watch as they browse third-party website… ").

[3] Notably, all of the screenshots contained in the Complaint appear to be hypothetical examples – they certainly are not tied to any particular Facebook user including Plaintiff.

concludes that, "Defendant disclosed to Facebook the video title and FID of a Gaia subscriber in a single transmission," but then immediately contradicts this conclusory statement in paragraph 54: "Pixel sent the information contained in this shot, including that which follows, to Facebook." Paragraphs 61 and 63 consistently echo this point. Plaintiff attempts to artfully add the possessive term "Defendant's" before the word "Pixel," but such a label does not make it so.

Reading between the lines, the Complaint's substantive allegations merely reflect Facebook's application of its own technology using Pixel and the c_user cookie. In reality, the Complaint allegations merely establish that Facebook is obtaining its users' FIDs and web browsing activity on Gaia's website by combining information from its c_user cookie and Pixel (and only after individuals such as Plaintiff decide to become Facebook users). In other words, as reflected below, Facebook is communicating information from its applications to itself, rather than Gaia affirmatively disclosing PII to Facebook:



Moreover, nowhere does Plaintiff allege that Gaia is in possession of its subscribers' FIDs (for subscribers that are also Facebook users). This is not surprising since Gaia has no reason to maintain this information nor would it have access to it. Accordingly, it begs the question as to how Gaia could disclose its subscribers' FIDs to Facebook. Indeed, the practical reality, as demonstrated by the substantive, non-conclusory Complaint allegations, is that Facebook utilizes its own technology through Pixel and the c_user cookie to identify and track its users' activity on Gaia's website. Simply put, activity *by Facebook* cannot give rise to a VPPA violation by Gaia.

### B.  Facebook IDs Do Not Constitute PII Under the VPPA.

Further, the Complaint allegations do not establish that an FID constitutes PII, or information "that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 290; *Eichenberger*, 876 F.3d at 985. The focus here is on whether an FID, in the form allegedly transmitted by Gaia, would readily permit an ordinary person to identify *a specific individual's* video-watching activity.

Plaintiff self-servingly alleges that an FID is "a unique sequence of numbers linked to an individual's Facebook profile that identifies the individual more precisely than a name or email address" and "a unique, personal and persistent identifier Facebook assigns to each of its users that allows anyone to look up the user's Facebook profile to learn that person's identify." (Compl. ¶¶ 7, 52.) Although Plaintiff makes conclusory allegations at paragraphs 58 and 59 that an ordinary person could use an FID to identify a subscriber, it is not that simple. First, Facebook does not verify that each of its subscriber's FID correlates to an individual person. Indeed, Facebook accounts can be maintained anonymously under pseudonyms, avatars, other fictitious information, or even for pets.[4] Second, and more importantly, an FID is just a text string containing letters, symbols and numbers. Per Plaintiff's allegations, an FID is conveyed through the c_user cookie as designated by a string of numbers following the text "c_user=". (*Id*. ¶ 54.) Thus, a hypothetical example of an FID could be: "c_user=100056478976987." The c_user text string is typically embedded in a series of lines of code and data. *See id*. ¶¶ 53, 61. Plaintiff fails to allege how an ordinary person could look at this type of embedded text string and conclude that it reflects an FID

---

[4] According to Facebook's website, it generally only verifies accounts of public figures or global brands. When it does so, these accounts are designated with the presence of a blue check mark. *See* https://www.facebook.com/help/196050490547892. The fact that Facebook only verifies notable persons, brands or entities means that the majority of Facebook FIDs likely are not verified. There are no allegations that Plaintiff's Facebook account was verified by Facebook.

that correlates to a specific individual. In fact, the c_user text string, standing alone, cannot identify a specific individual without significantly more context (indeed, that context is information maintained by Facebook). Courts have held that a static or anonymous string of numbers, standing alone, does not constitute PII. *See e.g.*, *Eichenberger*, 876 F.3d at 986 (Plantiff's Roku device number not PII under VPPA); *In re Nickelodeon*, 827 F.3d at 290 (holding that IP address is not PII under VPAA).[5] The key consideration here is what an ordinary person could discern from the information allegedly disclosed by Gaia, not whether someone with knowledge of Facebook's coding technology could do so.[6]

What's more, the fact that Facebook could decipher a person's identify using the c_user text string does not mean the FID constitutes PII. The key is what information Gaia discloses to Facebook, not what Facebook does with it. *See e.g.*, *Eichenberger*, 876 F.3d at 986 ("[T]he statute views disclosure from the perspective of the disclosing party. It looks to what information a video service provider discloses, not to what the recipient of the information decides to do with it."); *In re Nickelodeon*, 827 F.3d at 290 (stating that Google's ability to aggregate information to unmask

---

[5] *See also Perry v. CNN, Inc.*, No. 1:14-CV-02926-ELR, 2016 WL 4373708, at *4 (N.D. Ga. Apr. 20, 2016) (app ID number is not PII); *Ellis v. Cartoon Network, Inc.*, No. 1:14-CV-484-TWT, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (Android ID is not PII); *In re Nickelodeon Consumer Priv. Litig.*, No. 2443 (SRC), 2014 WL 3012873, at *10 (D.N.J. Jul. 2, 2014) ("*Nickelodeon I"*) (IP address and unique device identifier are not PII); *In re Hulu Priv. Litig.*, No. C 11-03764-LB, 2014 WL 1724344, at *12 (N.D. Cal. Apr. 28, 2014) (unique identifier is not PII); *cf. Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017) (noting, in preliminary injunction context, "there is no binding precedent" holding that a Facebook cookie containing a "Facebook ID" can constitute PII).
[6] In order to determine whether a c_user text string correlates to a specific individual, one would have to identify the FID from the string of data and enter the string into an internet browser to locate a potential Facebook account. Assuming one could log into the Facebook (you need an account), one would still have to determine whether the account identified a specific, verifiable individual rather than a fictitious account using Facebook's internal data and programming. This is a bridge too far.

identity of individuals not relevant to determination of whether statute violated); *Wilson v. Thriller, Inc.*, 2022 WL 1138073, at *6 (S.D.N.Y. April 18, 2022) (dismissing VPPA claim when associating UID with an individual required the receiving party to pair the UID with information from a user's Triller profile page). Here, Facebook is applying its technology using Pixel and the c_user cookie to identify and track its users' activity on Gaia's website. The fact that Facebook is able to apply its technology to identify its users' web browsing activity on Gaia's website does not create liability for Gaia under the VPPA.

### C. Gaia Did Not "Knowingly" Disclose PII to Facebook.

To state a claim under the VPPA, Plaintiff also must plead facts showing that Gaia *knowingly* disclosed to Facebook information that identified him and the specific video materials he watched. While "knowingly" is not defined in the statute, decisions interpreting that term in the VPPA context have held that "knowingly" means "actual knowledge. … [K]nowingly means consciousness of transmitting the private information. It does not merely mean transmitting the code." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1095; *see also Mollett v. Netflix, Inc.*, No. 5:11-CV-01629-EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012), *aff'd*, 795 F.3d 1062 (9th Cir. 2015). Plaintiff does not allege what is required to establish a VPPA claim, *i.e.*: "that [Gaia] knew that Facebook might combine an FID (contained in the c_user cookie) with the watch page address [i.e. the URL] to yield 'personally identifiable information' under the VPPA. *See id.* at 1097; *see also Robinson v. Disney Online*, 152 F. Supp. 3d 176, 183 (S.D.N.Y. 2015) (if a third party has to "reverse engineer" PII, there can be no knowing disclosure). Nor does the Complaint's allegations establish that Gaia had possession of its subscribers' FIDs such that it could knowingly transmit those FIDs to Facebook.

The facts alleged, therefore, fail to preclude the possibility that defendant "did not think it

13

was conveying PII, then there could be no knowledge of the conveyance." *Bernardino*, 2017 WL 3727230 at *9. In this case, Plaintiff has not alleged that Gaia even knew that the FID existed, much less that Gaia considered the FID to be PII or knew it was being transmitted through the c_user cookie.

Relatedly, for Gaia to be liable under the VPPA, Gaia must know the "nature of the information actually disclosed," not the informational capabilities of any third-party recipient" like Facebook. *See Robinson*, 152 F. Supp. 3d at 181. Thus, even if Gaia knew what Facebook might do with the information collected that would be insufficient to plausibly allege Gaia's knowledge for purposes of the VPPA. *Bernardino*, 2017 WL 3727230, *9 ("[W]hether [defendant Barnes & Noble] knew what Facebook might do with the information" was irrelevant to the VPPA knowledge inquiry).

The closest the Complaint comes to alleging knowledge is Plaintiff's conclusory allegations that Gaia purportedly had familiarity with the use of cookies in connection with advertising in general and it purportedly knew generally how Pixel worked. (Compl. ¶ 51.) These conclusory allegations do not satisfy Plaintiff's pleading obligations under *Iqbal*. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-681 (2009) (holding that bare allegation that defendants "knew" plaintiff would be subjected by others to "harsh conditions of confinement" was "conclusory and not entitled to be assumed true"). Plaintiff's allegations fall short of alleging that Gaia "knew that Facebook might link the user-identifying information in the c_user cookie with title bearing watch-page addresses" to construct PII. *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1105. Indeed, "[t]he point of the VPPA, after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information *connecting a certain user to certain videos*." *Id.* at 1095 (emphasis added). Plaintiff has not alleged facts to indicate that Gaia "actually knew" the FIDs allegedly

14

shared with Facebook were being used by Facebook to identify and match users with videos they viewed, and thus, Plaintiff's VPPA claim should be dismissed. *Id.* at 1091.

## CONCLUSION

For the reasons set forth above, Gaia respectfully requests that the Court dismiss Plaintiff's complaint for lack of subject matter jurisdiction and/or failure to state a claim upon which relief can be granted.

DATED this 8th day of March, 2024.

/s/ Kelsey C. Boehm
Thomas J. Krysa
Kelsey C. Boehm
Stephanie Adamo
Foley & Lardner LLP
1400 16th Street, Suite 200
Denver, Colorado 80202
Phone: 720.437.2027
Fax: 720.437.2200
tkrysa@foley.com
kboehm@foley.com
sadamo@foley.com

Todd A. Murray
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201-3340
Phone: 214.999.3000
Fax: 214.999.4667
tmurray@foley.com

Eileen R. Ridley
Foley & Lardner LLP
555 California Street, Suite 1700
San Francisco, CA 94104
Phone: 415.438.6469
Fax: 415.434.4507
eridley@foley.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March, 2024 I electronically filed the foregoing **DEFENDANT'S MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record for all parties.

<u>s/ Kelsey C. Boehm</u>